UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY, a California public interest organization,<br><br>   Plaintiff,<br><br>   v.<br><br>MARK W. COWIN, In his Official Capacity As Director Of CALIFORNIA DEPARTMENT OF WATER RESOURCES; SALLY JEWELL, Secretary, U.S. Department of the Interior, in her official capacity; DAN ASHE, Director, U.S. Fish and Wildlife Service, in his official capacity; and UNITED STATES FISH AND WILDLIFE SERVICE<br><br>   Defendants. | CASE NO: 1:15-CV-00884 LJO BAM<br><br>MEMORANDUM DECISION AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOC. 2) |

## I. INTRODUCTION

The operative Complaint, filed June 11, 2015 by the Center for Environmental Science, Accuracy & Reliability ("CESAR" or "Plaintiff"), seeks declaratory and injunctive relief against construction and operation of an Emergency Drought Salinity Barrier at West False River ("Salinity Barrier") by the California Department of Water Resources ("DWR"). Doc. 1. The Complaint also seeks to require the U.S. Fish and Wildlife Service ("FWS") to "reinitiate consultation of the 2008 Biological Opinion on the Coordinated Operations of the Central Valley Project [] and State Water Project [] ... due

to changed circumstances, to wit, the construction and operation of the Project[1] by the Department." *Id*. Plaintiff claims that installation and operation of the Salinity Barrier violates the Endangered Species Act ("ESA"). *Id*.

Before the Court for decision is Plaintiff's motion for a temporary restraining order and preliminary injunction ("TRO/PI Motion"), filed June 11, 2015. Doc. 2. This case was transferred to the undersigned as a related case on June 12, 2015, and a briefing schedule was set. Doc. 9. State and Federal Defendants filed opposition documents on June 15 and 16, 2015. Docs. 10-11 & 13-18. Plaintiff filed a reply on June 17, 2015, Doc. 19, along with the Declaration of Dr. Joseph Thorley, Doc. 20. The Court believes the papers present the issues cogently and finds it appropriate to rule without oral argument. *See* Local Rule 230(g).

## II. **STANDARD OF DECISION**

In order to secure injunctive relief[2] prior to a full adjudication on the merits, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22. The Ninth Circuit follows a "sliding scale" approach to preliminary injunctions. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, a weaker showing as to the likelihood of success on the merits may be offset by a stronger showing with respect to the balance of the equities. *Id.* at 1131-32. For example, if the moving party is unable to establish a likelihood of success on the merits, preliminary injunctive relief may still be had if the party

---

[1] The parties sometimes refer to the Salinity Barrier as "the Project."

[2] The substantive standard for granting a temporary restraining order is the same as the standard for entering a preliminary injunction. *See Frontline Med. Associates, Inc. v. Coventry Healthcare Workers Comp., Inc*., 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009); *see also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n. 2 (1977).

2

can show that (1) there are at least "serious questions" going to the merits; (2) the balance of the hardships tips "sharply" in its favor; and (3) the other factors listed in *Winter* (*i.e.*, irreparable harm and in the public interest) are satisfied. *Id.* at 1135. "Serious questions" in the context of preliminary injunctive relief are those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation and internal quotation marks omitted). They do not need to "promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (citation and internal quotation marks omitted).

In general, environmental injuries are considered irreparable because they "seldom [can] be adequately remedied by money damages, and [are] often permanent or at least of long duration." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). This does not mean that every environmental injury warrants injunctive relief; a plaintiff must still demonstrate that an irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 22. In ESA cases, the Ninth Circuit has found that "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction." *Marbled Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996). Proof of a threat of extinction to the species is not required, but a plaintiff must, at a bare minimum, establish a definitive threat of future harm based on something other than mere speculation. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n. 8 (9th Cir. 1994).

A heightened standard applies where a requested injunction would require the non-moving party to take affirmative action (*e.g.*, to remove or destroy something that has already been constructed). *Garcia v. Google, Inc.*, ___ F.3d ___, 2015 WL 2343586, at *4 (9th Cir. May 18, 2015) (reversing order requiring Google to "remove (and to keep removing)" a video from YouTube and other websites). Such relief is treated as a mandatory injunction because it "orders a responsible party to take action." *Id.* (internal citation and quotation omitted). A "mandatory injunction goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored." *Id.* The "district court should deny such relief

'unless the facts and law <u>clearly favor</u> the moving party." *Id*. (emphasis added). "In plain terms, mandatory injunctions should not issue in doubtful cases." *Id*.

### III. LEGAL BACKGROUND

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 778 (9th Cir. 2014) (en banc) ("*NRDC v. Jewell*") (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Section 7 of the ESA ("Section 7") requires federal agencies to ensure that their activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). Section 7's implementing regulations provide that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat[s]." 50 C.F.R. § 402.14(a). An agency proposing to take an action (often referred to as the "action agency") must first inquire of FWS[3] whether any threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). If endangered species may be present, the action agency must prepare a "biological assessment" ("BA") to determine whether such species "is likely to be affected" by the action. *Id*. If the BA determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with FWS. *See id*. § 1536(a)(2); 50 C.F.R. 402.14. Formal consultation results in the issuance of a "biological opinion" ("BiOp") by FWS. *See id.* § 1536(b). If the BiOp concludes that the

---

[3] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted jurisdiction over fish species which (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. FWS exercises jurisdiction over the delta smelt. Therefore, the remainder of this Memorandum Decision references only FWS as the agency administering the ESA.

4

proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless FWS can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a "reasonable and prudent alternative[ ]" to the agency action that avoids jeopardy and adverse modification, and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement" which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *ALCOA v. BPA*, 175 F.3d 1156, 1159 (9th Cir. 1999).

Even after consultation is complete, an agency has a duty to reinitiate formal consultation under certain circumstances, including where (1) "the amount or extent of taking specified in the incidental take statement is exceeded"; (2) "if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"; or (3) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16. "The consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Karuk Tribe*, 681 F.3d at 1020 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)).

Regulations promulgated to implement the ESA's consultation provisions provide that "[w]here emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures" followed by formal consultation once the emergency is abated. 50 C.F.R. § 402.05(a). The regulations explain that "[t]his provision applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." *Id*.

5

The FWS & NMFS Section 7 Consultation Handbook ("Handbook")[4] provides further detail, explaining that "[a]n emergency is a situation involving an act of God, disasters, casualties, national defense or security emergencies, etc., and includes response activities that must be taken to prevent imminent loss of human life or property." Handbook at 8-1. The action agency is responsible for determining whether an emergency exists and must submit information to either FWS or NMFS, as appropriate, describing the nature of the emergency action and the justification for the expedited consultation. 50 C.F.R. § 402.05(b).

During the initial stage of emergency consultation, FWS's role "is to offer recommendations to minimize the effects of the emergency response action on listed species or their critical habitat (the informal consultation phase)." Handbook at 8-1, § 8.2(A). FWS may not "stand in the way of the response efforts." *Id*. As soon as practicable after the emergency is under control, the action agency must initiate formal consultation with FWS if listed species or critical habitat have been adversely affected by emergency response activities. 50 C.F.R. § 402.05(b); Handbook at 8-4, § 8.2(B). "Although formal consultation occurs after the response to the emergency, procedurally it is treated like any other formal consultation," Handbook at 8-4, § 8.2(B), and culminates in FWS's issuance of a biological opinion, and, if appropriate, incidental take statement, *id.* at 8-4 to 8-5, § 8.2(C)-(D); 50 C.F.R. § 402.05(b).

## IV. FACTUAL BACKGROUND

The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated respectively by the Bureau of Reclamation ("Reclamation") and the [DWR for the] State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating in northern California to more than 20,000,000 agricultural

---

[4] *Available at* http://www.fws.gov/Endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited June 17, 2015).

and domestic consumers in central and southern California." *Id*. As part of CVP operations, Reclamation releases water stored in CVP reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San Joaquin Delta ("Delta"). *Id*. at 594. Pumping plants in the southern region of the Delta then divert to various users south of the Delta. *See id*. at 594-95.

The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish endemic to the [Delta]." *Id.* at 595. In 1993, FWS concluded the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993). FWS further determined that "Delta water diversions," including those resulting from operations of the CVP, are the most significant "synergistic cause[]" of the decline in the delta smelt population. *Id*. at 12,859.

California presently is in the fourth year of an "unprecedented drought, dropping the State's water supply to historic low levels." Declaration of Mark Holderman ("Holderman Decl."), Doc. 15, at ¶ 2. In April 2015, DWR's snow survey measured the water content in the Sierra snowpack "at only five percent of its historical average - the lowest snowpack ever recorded in California history." *Id*. The drought has "dramatically reduced the amount of water in the State's main reservoirs." *Id*. at ¶ 3. "Continuing drought conditions have severely reduced SWP and CVP water supplies, resulting in a second year of greatly reduced allocations to water agencies contracting with DWR and Reclamation. *Id*. at ¶ 4. "The 2015 water allocation to SWP water contractors is 20 percent of [] requested contract deliveries, while allocations to CVP agricultural water service contractors is zero percent." *Id*. "As a result of the drastic reduction in available water, DWR and Reclamation will be operating their respective Delta export pumping facilities at minimal rates necessary to support human health and safety needs and support water transfers from the Delta for millions of people in California." *Id*.

"The Delta is a complex system of interconnecting channels that provide numerous pathways for the tides to push salt water inland." *Id*. at ¶ 7. Under normal hydrologic conditions, water from rivers

and tributaries flowing into the Delta is sufficient to prevent seawater from migrating eastward into the Delta with each tidal pulse. *Id*. Due to the drought, "it is highly 8 uncertain that current SWP and CVP storage and anticipated inflows to the Delta will be sufficient to provide the usual hydraulic barrier to block the intrusion of ocean salinity into the Delta this summer." *Id*. If salinity intrudes into the Delta, reversing the intrusion will be difficult and high salinity levels could persist for an extended period. *Id*. Increased salinity levels persist in the Delta over a sustained period would have a detrimental impact on various municipal utilities' drinking water treatment plants. *Id*. In addition, if the salinity levels reach a certain point eastward in the Delta, the SWP and CVP may be unable to deliver water of sufficient quality for municipal and industrial use. *Id*.

In a series of executive orders and proclamations, the first of which issued January 17, 2014, Governor Edmund G. Brown, Jr., proclaimed a State of Emergency due to the drought and directed DWR to take necessary actions to protect water quality and water supply in the Delta. *Id*. at ¶ 5. Most recently, on April 1, 2015, Governor Brown issued Executive Order B-29-15 directing DWR to plan and, if necessary, implement Emergency Drought Salinity Barriers at locations within the Delta. *Id*. at ¶ 6. According to the Executive Order, the purpose of these barriers is "to conserve water for use later in the year to meet State and federal Endangered Species Act requirements, preserve to the extent possible water quality in the Delta, and retain water supply for essential human health and safety uses in 2015 and the future." *Id*.

After considering construction of barriers in three separate locations, DWR reduced the proposed project to a single Salinity Barrier, to be installed at West False River. *See* Declaration of Jeanne M. Kuttel ("Kuttel Decl."), Doc. 11, at ¶ 2. The Salinity Barrier is a trapezoidal structure (800 feet long, up to 200 feet wide at the base and 12 feet wide at the top) that stretches the length of the channel of West False River. *Id*. The Barrier is designed "to be a passive structure that will reduce salinity in the central Delta by reducing saltwater intrusion in the central Delta, thereby helping to ensure a reliable water supply." *Id*. The barrier has no active operational features; the only operational activities related to its

presence will be remote monitoring of various sensors. *Id*. DWR paid approximately $13 million for the barrier to be installed. *Id*. As of June 15, 2015, installation is complete, with roughly 150,000 tons of rock already in place. *Id*. at ¶3. The only work remaining is placement of safety signage and buoys, removal of exclusion fencing, addition of other site fencing, and demobilization/site cleanup. *Id*. DWR anticipates that even this work will have been completed by June 17, 2015. *Id*.

The Salinity Barrier will be removed by mid-November 2015, in advance of the rainy season. *Id*. at ¶ 4; Holderman Decl. at ¶ 9. Removal is anticipated to take six to eight weeks, plus an additional two weeks to prepare a suitable site on which to place the rock once removed. Kuttel Decl. at ¶ 4. It is anticipated that the cost of removal will be similar to the cost of installation. *Id*.

The main hydrologic effect of the barrier is to reduce salinity in the central and south Delta, particularly in the corridor between Franks Tract and the export facilities. Holderman Decl. ¶ 10. More specifically:

> The Salinity Barrier is designed to counter the effects of potentially extreme tides, known as King Tides, as well as the potential for unseen depletions by water users. The powerful King Tides can push ocean-derived salts further into the Delta, where the salt mixes with fresh water in side chrumels, increasing the difficulty in flushing poor quality water from the Delta.

*Id.* DWR models also suggest that the Barrier may improve water quality slightly throughout most of the Delta and Suisun Region. *Id*. The barrier has a limited effect in the eastern and northern parts of the region, with an expected change in X2 position[5] of less than 0.25 km. Salinity increases of up to 100 microSiemens/cm may occur in narrow bands in the Sacramento River near Rio Vista, Dutch Slough, and at the Head of Old River. *Id*.[6]

According to undisputed evidence submitted by DWR, if the Salinity Barrier were removed,

---

[5] "X2 is the point identified by its distance from the Golden Gate Bridge where salinity at the river's bottom is about two parts per thousand (ppt) and is the basis for standards to protect aquatic life (seawater salinity is about 35 ppt)." Holderman Decl. at ¶ 10; *see also San Luis v. Jewell*, 747 F.3d at 595.

[6] Attached to the Declaration of Mark Holderman as Exhibit 1 is a map of the main waterways in the Delta. *See* Doc. 15-1.

salinity levels in the Delta would degrade water quality to levels that would render it an unacceptable raw water source for drinking water or commercial and industrial uses, thereby creating risks to human health and safety. *Id*. at ¶¶ 11 & 12 (reviewing DWR modeling of electrical conductivity ("EC") and bromide concentrations). "The high salinity concentrations would also significantly increase the costs of producing drinking water, resulting in unforeseen economic hardships." *Id*. at ¶ 11. DWR's modeling also indicates that without the Salinity Barrier in place, bromide concentrations may reach unacceptable levels. *Id*. at ¶ 15. Bromide plays a role in the formation of water disinfection byproduct ("DBP") contaminants, which can lead to adverse health effects. *Id*.

An increase in salinity and bromide concentrations would put at risk several communities and local water suppliers dependent upon that water supply. *Id*. at ¶ 15. The Contra Costa Water District, which serves approximately 500,000 people, is almost entirely dependent on the Delta for its water supply; the City of Tracy is entirely dependent upon the Delta for its water supply; and millions of people in the San Francisco Bay Area that are served by Santa Clara Valley Water District, Alameda County Water District, and Alameda County Flood Control and Water Conservation District (Zone 7) are substantially dependent on the quality of water pumped at the SWP export facilities in the south Delta. *Id*. at ¶ 19. Increasing salinity concentrations result in increased costs in operations at drinking water treatment plants in these areas. *Id*. (explaining that "Alameda County Water 3 District spent an additional $385,000 on chemicals alone to treat poor water quality to the drinking water Standards"). *Id*. If the SWP and CVP are unable to deliver water with a low enough EC concentration, water suppliers may be unable to provide enough water to meet municipal and industrial demands. *Id*. at ¶ 20.

By letter dated April 20, 2015, DWR requested a Clean Water Act Permit from the U.S. Army Corps of Engineers ("Corps") for the Salinity Barrier. Declaration of Dan Castleberry ("Castleberry Decl."), Ex. A, Doc. 18-1. DWR explained that the Barrier needed to be installed immediately to prevent saltwater intrusion into the Delta resulting from the prolonged drought, and that in-water work had to begin by May 7, 2015 "to prevent degradation in Delta water quality that would be extremely difficult to

reverse with a later installation date." *Id*. DWR asked that its application be processed pursuant to the Corps' emergency procedures. *Id*.; *see* 33 C.F.R. § 325.2(e)(4). In addition, because the Corps' issuance of a permit is a federal agency action subject to the ESA's consultation requirement, DWR requested that the Corps engage in emergency ESA consultation with the Service pursuant to 50 C.F.R. § 402.05. DWR provided a detailed justification in support of its request. Castleberry Decl., Ex. A (enclosure), Doc.18-1.

The Corps initially requested formal consultation with FWS pursuant to ESA Section 7(a)(2), noting that DWR's construction of the temporary barrier could adversely affect the threatened delta smelt. Castleberry Decl., Ex. B, Doc. 18-2. The Corps subsequently modified its request to seek emergency consultation under 50 C.F.R. § 402.02. Castleberry Decl., Ex. C, Doc. 18-3.

On May 1, 2015, FWS responded to the Corps' request. Castleberry Decl., Ex. E, Doc. 18-4. FWS recommended that the Corps ensure that DWR implement conservation measures to avoid and minimize impacts to ESA-listed species, including the delta smelt. *Id*. FWS also requested that the Corps direct DWR to remove the temporary barrier by November 15, 2015, and that the Corps initiate formal ESA consultation with the Service "[a]s soon as practicable after the emergency is under control," consistent with 50 C.F.R. § 402.05(b). *Id*.

On or about May 4, 2015, the Corps issued DWR the requested Clean Water Act ("CWA") Permit, requiring compliance with the conservation measures requested by the Service. Declaration of Dan Fuchs ("Fuchs Decl."), Ex. B, Doc. 10-2. The CWA Permit requires removal of the temporary barrier by November 15, 2015. *Id*. at 4. Barrier removal will require approximately 45-60 days, and is expected to commence on or about October 1, 2015. Castleberry Decl., Ex. B at 3. FWS admits that formal consultation has not yet issued a biological opinion concluding the emergency consultation process. Doc. 17 at 15.

Plaintiff filed suit in the Superior Court of California for Sacramento County on May 6, 2015, Fuchs Decl., Ex. G, and immediately applied ex parte for a temporary restraining order to halt

11

1 construction of the Salinity Barrier. Fuchs Decl., Ex. H. Hon. Christopher Krueger held a hearing and

2 issued a minute order denying the request for a temporary restraining order on May 15, 2015. Fuchs

3 Decl., Ex. N. DWR's opposition papers stated that construction of the Salinity Barrier would take 45–60

4 days. Fuchs Decl., Ex. M, at 4:3-5. The court set a hearing on Plaintiff's motion for a preliminary

5 injunction on a date selected by Plaintiff, June 19, 2015, at the tail end of the period DWR indicated was

6 needed to complete construction of the Salinity Barrier. Fuchs Decl. at ¶ 22. On May 26, 2015, Plaintiff

7 requested that the motion hearing be taken off calendar and stated that it would not be filing the motion.

8 Fuchs Decl., Ex. O. The state action has not been dismissed, but no activity has occurred since the May

9 15, 2015 order denying Plaintiff's application for a temporary restraining order. Fuchs Decl. at ¶ 24.

10 On June 11, 2015, Plaintiff commenced the instant action and moved for a TRO/PI to halt

11 construction of the Salinity Barrier. Docs. 1& 2.

## V. DISCUSSION

**A.    60-Day Notice Requirement.**

The ESA precludes the commencement of citizen suits "prior to sixty days after written notice of the violation has been given to the [FWS], and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(i). The 60-day notice requirement is "jurisdictional, and thus failure to strictly comply is an absolute bar to bringing suit under the ESA." *Conservation Congress v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014) (internal quotation and citation omitted). To satisfy the notice requirement, a plaintiff must "provide sufficient information of a violation so that [FWS and/or the action agency] could identify and attempt to abate the violation." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998).

Here, Plaintiff alleges that:

> As required by 16 U.S.C. § 1540(g)(2)(A)(i), plaintiff [] provided the defendants notice of the violations described in this complaint by letters dated March 19, 2014 and June 16, 2014. Plaintiff sent the notice to each of the defendants by U.S. mail. More than 60 days have passed since Defendants received these notices and Defendants have not responded to

the notices.

Doc. 1 at ¶ 20. DWR points out in its opposition brief that neither letter is in the record. Doc. 16 at 8. Plaintiff fails to provide a copy of either document in reply. Therefore, the Court is unable to determine whether the 60-day notice requirement has been satisfied. The TRO/PI Motion may be denied on this ground alone.[7]

**B.** **Request to Enjoin Construction & Operation Moot.**

Even assuming Plaintiff has satisfied the 60-day notice requirement, its request fails on the merits. The TRO/PI Motion specifically requests that Defendants be "temporarily restrained from continued construction and operation of the [Salinity Barrier] in the Bay-Delta at the West False River location as it is resulting directly and indirectly in 'take' under the ESA of the federally listed species, delta smelt." Doc. 2-6 (proposed TRO/PI order). The undisputed record evidence demonstrates that construction is complete and that there are no "operations" to be enjoined, as the Salinity Barrier is a passive structure. Therefore, Plaintiff's request for an injunction against further construction/operation must be **DENIED AS MOOT**.

**C.** **Construing the TRO/PI Motion as a Request to Remove the Barrier, Plaintiff Has Failed to Meet the Heightened Requirements for a Mandatory Injunction Because It Has Failed to Demonstrate a Reasonably Certain Threat of Imminent Harm to the Species.**

Plaintiff's only mention in its Reply brief of the fact that construction is already complete is to argue that "Defendant's assertion that construction being complete negates the requirements of compliance with the ESA is contrary to the law." Doc. 19 at 4. This entirely misses the point. It is possible that this case may proceed to decision on the merits despite the fact that the action sought to be permanently enjoined in the Complaint has been completed. Determining whether any exception to the mootness doctrine applies is beyond the scope of the present motion for injunctive relief. What is at

---

[7] The Parties spend considerable time arguing whether or not Plaintiff's TRO/PI Motion should be denied outright because Plaintiff unreasonably delayed seeking relief in this Court. Because the Motion must be denied on multiple other grounds, the Court declines to address this issue, which is arguably complicated by the existence of the 60-day notice period.

issue here is whether Plaintiff can establish entitlement to the extraordinary remedy of an injunction. Even assuming, *arguendo*, Plaintiff is likely to succeed on the merits of its ESA claim, it must still establish "[a] reasonably certain threat of imminent harm to a protected species." *Marbled Murrelet*, 83 F.3d at 1066. In the context of a request for a mandatory injunction,[8] a court "should deny such relief unless the facts and law <u>clearly favor</u> the moving party." *Garcia*, 2015 WL 2343586, at *4 (emphasis added). "In plain terms, mandatory injunctions should not issue in doubtful cases." *Id*.

Here, Plaintiff has not met its burden. Plaintiff points to both the BA prepared by the Corps and the Incidental Take Permit issued by the California Department of Fish and Game ("CDFG") related to take of species listed under the California Endangered Species Act ("CESA") to establish that take will occur. *See* Doc. 2 at 20. While these documents acknowledge that some take may occur as a result of construction of the Salinity Barrier[9] and its presence in the Delta, *see e.g.*, Biological Assessment of Potential Effects on Listed Fishes from the Emergency Drought Barrier Project (April 28, 2015) ("BA")[10], at 86-88 & 101-118, this is insufficient on its own to establish irreparable harm. "[T]o consider any taking of a listed species as irreparable harm would produce an irrational result." *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009). "The ESA permits incidental takes of a listed species." *Id.* (citing 16 U.S.C. § 1536(b)(4)). While the death of a small number of individuals of a species may constitute irreparable harm, injunctive relief is only warranted where "loss of those individuals would be significant for the species as a whole." *Pacific Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n. 12 (E.D. Cal. 2008) (emphasis omitted). Irreparable injury requires harm "significant" to the "overall population." *Id*. at 1210; *see also Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d at 1209.

---

[8] Plaintiff has not actually requested removal of the Barrier, but is nevertheless proceeding with its TRO/PI Motion despite the undisputed fact that the Barrier is complete. In an abundance of caution, the Court construes this action as a request to require DWR to remove the barrier, as Plaintiff has not articulated any alternative request.

[9] As construction is complete, the Court will not consider harm to the smelt caused by construction in evaluating whether irreparable harm exists.

[10] *Available at*: https://bdo-portal.water.ca.gov/documents/92073/262475/EDB_Aquatic+BA_042915_.pdf (last visited June 18, 2015).

It is undisputed that survey data reveal that delta smelt populations are at alarmingly low levels this year. Declaration of Rob Roy Ramey II ("Ramey Decl.") at ¶13. But nothing in Plaintiff's submissions establishes that any take caused by the continued presence of the Salinity Barrier will be anything more than "incidental," let alone that it would be "significant." Plaintiff's reply declarant, Joseph Thorley, states:

> The <u>potential</u> concern is that sub-juveniles or juveniles rearing upstream of the [Barrier] are adversely affected by lower salinity or higher entrainment. The Lower San Joaquin River including the West False River has historically provided important spawning and sub-juvenile rearing habitat (Merz et al. 2011). Under the current drought conditions the importance of the upstream habitat for juvenile rearing may have increased. Furthermore given the record low abundance even a low entrainment level represents a substantial proportion of the population. Despite these concerns <u>no attempt is made to formally model the salinity changes in terms of Delta Smelt habitat use and distribution</u>.
>
> []Water temperatures influences juvenile and subadult Delta Smelt growth and mortality and subsequent female fecundity through a variety of mechanisms including food, metabolism, disease and cyanobacterial blooms. Given the <u>potential</u> for large-scale adverse changes in water temperature it is remarkable that there is <u>no formal modelling of this key environmental parameter</u>.
>
> []It is my professional opinion based on a review of the relevant documents that there is currently insufficient information to <u>exclude the possibility</u> that operation of the Emergency Drought Barrier in the West False River is adversely affecting Delta Smelt.

Declaration of Joseph Thorley ("Thorley Decl.") at 6-7 (emphasis added). But, the "potential" for higher entrainment or other impacts does not establish that it is likely to occur, nor does the absence of formal modeling. Moreover, the "potential" impacts feared by Plaintiff appear to have been examined by the action agency and found to be of minimal concern. *See, e.g.,* BA at 101 (finding there would be "little difference" in entrainment loss between the Project and no-Project scenarios). It is Plaintiff's burden to establish that the "<u>facts</u> and the law" clearly establish the right to a mandatory injunction. Plaintiff has not met its burden.

15

**D.** **Abstention Doctrines.**

DWR argues that this Court should dismiss this action under the abstention doctrines articulated in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and/or *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942). The Court declines to rule on these issues at this time, as they are not necessary to resolution of the pending, emergency motion. This is without prejudice to Defendants' raising these issues in a subsequent motion.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's motion for a temporary restraining order and preliminary injunction is **DENIED**.

IT IS SO ORDERED.

Dated:   **June 18, 2015**                              /s/ Lawrence J. O'Neill
                                                                      UNITED STATES DISTRICT JUDGE